FILED

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

00 AUG 2?

JAMES A. WHEELER and
REGINALD COOK, JR.,

      Plaintiffs,

v.

LOCKHEED MARTIN MISSILES &
SPACE,

      Defendant.

}
}
}
}
}
}
}
}
}
}
}
}
}

U.S. DISTRICT COURT
N.D. OF ALABAM

CASE NO. CV 99-B-0847-NE

ENTERED

? ? 2000

## MEMORANDUM OPINION

This action is before the court on Defendant's Motion for Summary Judgment on Claims of Plaintiff Wheeler and Defendant's Motion for Summary Judgment on Claims of Plaintiff Cook, filed by defendant Lockheed Martin Missiles & Space ("defendant" or "Lockheed Martin").  Plaintiffs Reginald Cook, Jr. ( "Cook") and James A. Wheeler ("Wheeler") (collectively, "plaintiffs"), both African-Americans, assert claims of race-based discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended, and 42 U.S.C. § 1981.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion is due to be granted.

## I.  FACTUAL SUMMARY

Wheeler and Cook allege that they were discriminated against and retaliated against on the basis of their race.  The conditions precedent for suit were satisfied by charges of discrimination filed by both plaintiffs with the Equal Employment Opportunity Commission ("EEOC") on November 25, 1997.  (DX 13; DX 15.)[1]  Cook received his Notice of Right to Sue on January 29, 1999, and Wheeler received his Notice of Right to Sue on January 7, 1999.  (DX 14; DX 16.)

Wheeler and Cook each assert two claims.  Wheeler contends that he was denied a promotion or job assignment to a position called "OSI Lead on the Integrated Product Team for Lockheed" in October of 1997, based upon his race.  (Plaintiffs' Response Brief in Opposition to Defendant's Motion for Summary Judgment ("Pls.' Br.") at 5-6, 14-16.)  Wheeler also contends that, in retaliation for his internal complaints of race discrimination and his EEOC charge challenging this alleged discrimination, his job performance appraisal scores dropped.  (*Id.* at 21-22.)  Similarly, Cook asserts that he was discriminatorily denied a promotion or job assignment to a position called Deputy Group Manager of the Theater High Altitude Area Defense ("THAAD") program, on July 18, 1997, because he is African-American.  (*Id.* at 12-14.)  Cook

---

[1]  The documents listed in Index and Description of Documents Submitted in Support of Brief in Support of Motion for Summary Judgement by Defendant Lockheed Martin Missiles and Space will be referred to as "DX," followed by the corresponding exhibit number.  The documents listed in Plaintiffs' Evidentiary Submission in Support of Plaintiffs' Response Brief in Opposition to Defendant's Motion for Summary Judgment will be referred to as "PX," followed by the corresponding exhibit number.  The documents listed in Supplement to Plaintiffs' Evidentiary Submission in Support of Plaintiffs' Response Brief in Opposition to Defendants' Motion for Summary Judgment will be referred to as "PX Supp.," followed by the corresponding exhibit number.

also alleges that he suffered retaliation for filing an internal complaint and filing his EEOC charge in that he was given lower performance appraisal scores, labeled a "troublemaker," and received an anonymous note stating that he was being watched. (*Id.* at 21-23.)[2]

## A.    Background

The United States Army awarded Lockheed Martin a contract in 1992, to design and, ultimately, manufacture a missile defense system which can be deployed on the battlefield to protect troops. (DX 36 (Aff. of Charles Durrin) at ¶ 3.) The system, known as THAAD, is designed to intercept and destroy missiles flying at supersonic speeds. (*Id.*) Although the entire THAAD program is governed by Lockheed Martin as primary contractor, many aspects of development are assigned by defendant to outside subcontractors who perform the work with their own employees. (*Id.* at ¶ 4.) The amount of work done by outside contractors on particular portions of THAAD has varied at all times material to this suit. (*Id.*)

The THAAD system has progressed simultaneously on several fronts, including designing and testing software and hardware components. (*Id.* at ¶ 5.) Lockheed employees working on the THAAD program are assigned to five groups called "segments." (*Id.*) Those segments are: (1) battle manager, (2) launcher, (3) radar, (4) missile, and (5) weapons system

---

[2] In Defendant's Brief in Support of Its Motion for Summary Judgment ("Def.'s Br."), defendant addressed several other denials of promotion alleged by and testified to by Wheeler in his deposition. Defendant sought summary judgment for these claims on grounds that such claims were time-barred and otherwise without merit. Wheeler did not dispute these arguments in Plaintiffs' Response Brief in Opposition to Defendant's Motion for Summary Judgment. Further, Wheeler stipulated at oral argument that these claims are not encompassed by the EEOC charges and the complaint and, thus, are not being asserted in this litigation. Similarly, included in defendant's brief were defenses to contentions made by Cook during his deposition that he was denied promotions with an intent to retaliate against him for filing his charge and complaint. Cook stipulated at oral argument that these claims were due to be dismissed.

integration. (*Id.*)  The first four segments correspond to an individual physical component of the THAAD system, and the remaining segment, weapons system integration, is responsible for merging the other four segments into one system and to resolve conflicts between the various segments. (*Id.*)  A segment manager supervises the work of all engineers and other personnel within each segment of the THAAD system. (*Id.*)  The chief system engineers oversee all engineering work on THAAD, and the director of the program assumes overall responsibility for THAAD. (*Id.*)

Because the system is highly complex, development proceeds in stages, known as "builds." (*Id.* at ¶ 6.)  Each build adds and tests new capabilities to the system's software. (*Id.*)  As work and testing on one build is nearing completion, preliminary work on the next build has typically already begun. (*Id.*)  The THAAD contract calls for up to eight builds. (*Id.*)  Builds one through three are known as the Demonstration/Validation, or Dem/Val, portion of THAAD's development, during which the primary goal is to demonstrate to the customer, the U.S. Army, that THAAD's underlying theories and objectives are sound. (*Id.*)  Builds four through eight constitute the second stage of THAAD development, known as Engineering Manufacturing and Development ("EMD"). (*Id.*)  During this stage, the THAAD system moves toward actual production and deployment of the missiles. (*Id.*)

At the 1992 inception of the THAAD project, Lockheed Martin assigned primary responsibility for builds one, two, and three to Litton Industries, with oversight by Lockheed engineers. (*Id.* at ¶ 7.)  In 1995, builds one and two were suffering from delays and other problems and Lockheed re-assumed all the duties from Litton, and took primary responsibility for all remaining work on the THAAD program, including build three. (*Id.*)  Development of

4

other portions of THAAD have been intermittently assigned to various subcontractors, including

Raytheon.  (*Id.*)

Lockheed Martin utilizes written policies known as Enterprise Management Policies,

("EMP") to control the hiring, promotion, and selection processes relative to all job applicants,

whether internal or external.  (DX 34 (Aff. of Gail Jackson) at ¶ 4, Ex. A.)[3]  At all times material

to this complaint, the EMPs did not require Lockheed Martin managers to post a vacancy, file a

requisition, or initiate a formal selection process for making changes in non-leadership positions

involving: (1) internal applicants, or leadership positions which involve placements within the

same organization; (2) transfers within the same business unit where the job code and salary do

not change; or (3) transfers of incumbent employees and their job functions due to an

organizational restructuring.  (*Id.* at ¶ 5, Ex. A.)

For those positions requiring a formal selection process, the process begins upon receipt

of an employee requisition, which specifies the requirements for an available opening and

authorizes staffing to initiate internal and/or external recruitment.  (*Id.* at ¶ 6; DX 30; DX 31.)

When the requisition is opened, applications are received and candidates are evaluated either by

the hiring manager or by a selection committee.  (DX 34 at ¶ 6.)  Interviews of the qualified

candidates may be conducted at the discretion of the hiring manager.  (*Id.*)

The two engineering positions at issue in this case are within Lockheed Martin's

Engineering and Technology business unit.  (*Id.* at ¶ 7.)  Under defendant's policies, as described

---

[3]  At all times relevant to the claims in this suit, Gail Jackson ("Jackson") was the human
resources lead at Lockheed Martin's Huntsville, Alabama facility.  (DX 34 at ¶ 2.)  She was
responsible for maintaining all personnel records at the Huntsville facility relating to hiring,
selection, and promotion of all personnel.  (*Id.*)

above, Lockheed Martin's managers are authorized to fill any open engineering positions within any business unit with employees already assigned to the unit without a formal selection process, without a requisition, and without posting, as long as the selected candidate does not receive a job code or salary level change as a result of the assignment.  (*Id.* at ¶ 7, Ex. B.)  Similarly, under accepted Lockheed Martin policies and practices, defendant may transfer employees within an organization to another position within the organization, or give such employees other duties, without a formal selection process, without a requisition, and without posting.  (*Id.* at ¶ 8.)  The term "organization" as used in the EMP refers to smaller skills-based groups within each business unit, such as systems engineering, specialty engineering, or software engineering.  (*Id.*)  Lockheed's policies allow transfers of existing employees and job functions to a new organization as part of a restructuring without a requisition, posting, or a formal selection process.  (*Id.* at ¶ 9.)

**B.   Wheeler's Claims**

Lockheed Martin first hired Wheeler in March of 1990, as a systems engineer assigned to the air defense portion of the U.S. Army's tactical command and control system program in Fort Washington, Pennsylvania.  (DX 27 at 18-19; DX 24.)  Wheeler transferred to Lockheed Martin's Huntsville, Alabama facility in April of 1991, to provide support for the Army tactical command system.  (DX 27 at 19.)  Wheeler resigned from this position in May of 1992, to accept a job as a senior systems engineer with CAS, Inc., also in Huntsville.  (*Id.* at 21.)  Five months later, Wheeler sought to rejoin Lockheed Martin at its Huntsville facility because he wanted to work on Lockheed Martin's "up and coming" THAAD program.  (*Id.* at 25-26.)  He was rehired by Lockheed Martin in November of 1992.  (*Id.* at 26.)  Lockheed Martin assigned Wheeler to the

6

battle manager segment, overseeing the work of Litton Industries on software development of command and control systems for builds one, two, and, later, three. (*Id.* at 27.)

Wheeler claims he was discriminated against on the basis of his race because Lockheed Martin did not assign him the position of Operator System Interface ("OSI") Development Head for THAAD EMD on build four on October 1, 1997.[3] (Complaint at ¶ 9.) Wheeler contends that Charles Durrin ("Durrin"), BM/C3I segment manager, the manager responsible for this job, assigned this position to David Burke ("Burke"), a white engineering planner. (Pls.' Br. at 5-6; DX 27 at 79-80.) The evidence in the record reveals, however, that no job entitled "OSI Development Head for EMD" exists or existed at Lockheed Martin, and there is no single Lockheed Martin employee whose job entails the responsibilities implied by that title. (DX 33 (Dep. of Charles Durrin) at 76-77, 79-81, 104.) Burke testified that he never held a position described as OSI Development Head for EMD. (PX Supp. 6 (Dep. of David Burke) at 81, 87-88, 102, 121-22, 123-24,133.)

Burke briefly led the requirements task for OSI for EMD, build four, but builds four through eight then became the responsibility of Raytheon in early 1998. (*Id.* at 80-83, 101-03, 126; DX 33 at 78-80.) Although Burke referred to himself on one occasion as the lead for OSI for EMD in an e-mail to Durrin, Durrin told Burke that he did not hold such a position, had not been assigned that role, and should not refer to himself in that capacity. (DX 33 at 81; PX Supp. 6 at 121-22.) Durrin also told  Burke that Raytheon had the responsibility to lead development

---

[3]  Wheeler also calls this position "OSI Lead on the Integrated Product Team." (*See* Pls.' Br. at 5.) A "lead" is a person responsible for filling the manpower position. (DX 27 (Dep. of James Wheeler) at 46.) Thus, a lead makes decisions regarding hiring of personnel, rating personnel, designing and making schedules, and tasking work out. (*Id.*)

of OSI for EMD, and that no such position existed at Lockheed Martin. (*Id.*) During the time period in which the above events transpired, Wheeler had been appointed and was functioning as lead for a portion of the OSI development for build three, which remained Lockheed Martin's primary responsibility. (DX 33 at 72-75, 104; PX Supp. at 84-85.)

Wheeler also contends that he has suffered retaliation for complaining about alleged race discrimination by Lockheed Martin in an internal complaint, dated October 22, 1997, and in his EEOC charge, dated November 25, 1997. (Pls.' Br. at 21-22; *see also* PX 13, PX 14.) The acts of retaliation to which Wheeler cites involve negative comments and low scores in salaried performance appraisals ("SPA") given to him subsequent to his October 22, 1997 internal complaint. (DX 27 at 147-58.)

Wheeler's 1997 SPA, which was dated June 23, 1997, prepared by Scott Colella ("Colella") and reviewed by Carl Cawood ("Cawood") stated:

> Jim has been doing an outstanding job as a Build 3 Technical Lead for OSI development, . . . He requires very little guidance and performs high quality work. . . . Jim did an outstanding job, in a short time frame, getting out the OSI SRSs. . . . He was instrumental in fixing the specification, working long hours in a short timespan . . . [He] did a fine job representing BM/C3I . . . . [H]e took the lead role . . . [and] made significant contributions to the overall THAAD ILS effort in preparation for EMD.

(DX 33 at Ex. 3; PX 15.) On Wheeler's 1997 SPA, he was rated highly effective in eight areas, and exceptional in one area.[4] (*Id.*)

---

[4] The evaluation and comments section on the SPA form permits reviewers to rate the employee as "must improve, moderately effective, fully effective, highly effective, or exceptional," in each of the following nine areas: quantity of work, quality of work, interpersonal relationships, communications, closure, reasoning/judgment, initiative, technical depth, and technical breadth. (*See, e.g.,* PX 15.)

Wheeler's 1998 SPA is substantially the same as his 1997 SPA, which was also prepared

and reviewed by Colella and Cawood. (PX 15.) Wheeler's 1998 SPA, which he signed on June

19, 1998, stated:

> Jim's [q]uality of work is top-notch. He is very thorough and organized leading
> to a strong product. . . . He is [a] very good communicator, he knows when and
> how to document and is very good at expressing himself. . . . . Jim uses his
> wealth of knowledge in the BMC4I System and Software Domain effectively. . . .
> He has been doing a good job of pulling the group together to develop STE
> system and software requirements.

(*Id.*) The 1998 SPA reflects that Wheeler was rated fully effective in two areas, highly effective

in six areas, and exceptional in one area. (*Id.*) His RPL[5] for 1998 was 11. (*Id.*) Based on the

these evaluations and Wheeler's RPL scores, Wheeler was eligible for and received merit pay

increases in both 1997 and 1998. (DX 34 at ¶ 15.)

On March 31, 1999, Wheeler bid for a position as BM/C3I Hardware Lead at a salary

level five, which was one level higher than his position at that time. (DX 34 at ¶ 16, Ex. I.) He

was promoted to the new position on May 22, 1999. (*Id.* at ¶ 16; DX 27 Tab A at 8-9.) This

promotion placed Wheeler in a new organization with new supervisors and new responsibilities.

(DX 27 Tab A at 9-11.) Wheeler's evaluation for the time frame May 22, 1999, through June 30,

1999, rated Wheeler as fully effective in eight areas, and highly effective in one area. (PX 15;

DX 34 at Ex. J; DX 33 at Ex. 7, Ex. 8.) The comments section to the 1999 SPA stated:

> Jim effectively lead the BSITE system segment specification development effort. .
> . . Jim also performed effectively as a moderator . . . . Although Jim was effective
> on the BSITE team, he needs more guidance than anticipated for someone with

---

[5] "RPL" stands for "relative performance level," and this score is used to compare salaried
personnel's salary against other Lockheed Martin employees who have similar job performance
scores. (DX 34 at ¶ 24.)

his experience.  He needs to work on his initiative and self-starter skills.  Jim has failed on numerous occasions to reach closure of time critical anomaly investigations and technical assignments. . . . Jim has required almost daily step-by-step direction for most all of his tasks and technical investigations.  He has yet to become MRB certified which is a critical requirement for his hardware lead position.  Jim needs to improve on his time management, organizational skills, closure, anomaly investigation processes, documentation and attention to detail.

(PX 15.)  His RPL for 1999 was 10.  (*Id*.)  Even though Wheeler's RPL was one point less than

his RPL score in the prior, lower-rated job, he still qualified without restriction for merit-based

pay increases, which he has since received.  (DX 34 at ¶ 16.)

## C.     Cook's Claims

General Electric Aerospace hired Cook on January 4, 1988, at its Syracuse, New York

facility, as a systems engineer.  (DX 28 (Dep. of Reginald Cook) at 14-15; DX 25.)  That

company later merged with Martin Marietta, which later merged with Lockheed Corporation to

become Lockheed Martin.  (DX 28 at 16-17.)  Cook remained employed in Syracuse through

these mergers, Lockheed Martin subsequently laid him off pursuant to a reduction in force in

1994.  (*Id*. at 21.)  On October 31, 1995, Lockheed Martin rehired Cook as a systems engineer at

Lockheed Martin's Huntsville, Alabama facility.  (*Id*. at 27-28.)  Since that time, Cook has

worked as a systems engineer on the THAAD program in the area of segment and interface

integration.  (*Id*. at 66.)

In May of 1997, defendant selected Bob Eisenberger ("Eisenberger") as the manager of

segment and interface integration for the THAAD program.  (DX 32 (Dep. of Robert

Eisenberger) at 9-10.)  Eisenberger and half of the engineers, or integrators, that he was to

supervise reside in Sunnyvale, California and work in defendant's Sunnyvale office.  (*Id*. at 19,

33.)  The rest of the integrators, including Cook, reside and work in Huntsville, Alabama, where

10

the Army's THAAD Project Office ("TPO") is located. (*Id.* at 33-34.) Eisenberger and his

immediate supervisor, John Snyder ("Snyder"), determined that Eisenberger should designate

one of the Huntsville-based integrators to "be the eyes and ears of Sunnyvale" in Huntsville and

to facilitate communication with the Army's TPO, which was the customer for the THAAD

project. (*Id.* at 32-36, 40-41.)

According to Eisenberger, the Huntsville-based integrator in this position would be his

contact for updates on the progress of the integrators in Huntsville and for passing out

assignment lists. (*Id.* at 40-41; PX 8.) Eisenberger, who has no military experience, wanted a

liaison in Huntsville who could relate to the structure and temperament of the U.S. Army. (DX

32 at 56-57. Eisenberger testified that the primary criteria he considered in making the selection

were (1) communication skills, and (2) experience with the battle manager segment of the

operation. (*Id.* at 69-70.) The position Eisenberger and Snyder created was referred to as the

"deputy group manager," but was later changed to the "Huntsville coordinator position." (*Id.* at

90; PX 8.)

Initially, at Snyder's direction, Eisenberger offered the position to Bob Glick ("Glick"),

an experienced Huntsville integrator who had applied and been rejected for the Eisenberger's

position. (DX 32 at 37; DX 28 at 88.) Glick declined the position. (*Id.*) Snyder then

encouraged Eisenberger to consider the four engineers from within his integration group and to

ask the Huntsville managers to suggest any other possible candidates. (DX 32 at 38, 43.)

Eisenberger spoke with Don Andrews ("Andrews"), Jeff Kepley ("Kepley"), and Cawood, who

readily identified Cook and Jack Grindstaff ("Grindstaff") as the two most qualified candidates.

(*Id.* at 38-39.) Andrews, Kepley, and Cawood informed Eisenberger that Cook was a "solid

11

systems engineer, fairly deep technically," but that he did not have prior management experience. (DX 32 at 40.)  Andrews, Kepley, and Cawood reported that Grindstaff "ha[d] acted as a lead position before, . . . ha[d] . . . interface[d] with the customer, . . . is a good communicator, and . . . has a lot of Army experience in the development and integration of similar type[s] of missile systems."  (*Id.* at 43-44.)  No negative comments were made about either candidate, but the consensus was that Grindstaff seemed better suited to handle the coordination aspects of the job because of his prior experience as a hardware lead, his familiarity with the battle manager segment, and his twenty-four-year Army career background.  (DX 32 at 43-44; DX 28 at 94-104; PX Supp. 5 (Dep. of Jack Grindstaff) at 45.)  Eisenberger also relied on his firsthand observation of the job performances of both men during his first month as manager of the segment and interface integration group.  (DX 32 at 46-48, 52-54.)  In Eisenberger's opinion, Grindstaff demonstrated initiative and availability while Cook was difficult to reach by phone and was not as available as Grindstaff.  (*Id.*)  Based on the reasons noted above, Eisenberger selected Grindstaff for the position on July 18, 1997.  (*Id.* at 52; DX 15.)  Cook filed an internal complaint of race discrimination on October 20, 1997, and an EEOC charge on November 25, 1997, over this selection.  (DX 28 at 141-46; DX 15; DX 17.)

Cook also alleges that he suffered retaliation for voicing his complaints about being denied the Huntsville Coordinator position.  (*See* Pls.' Br. at 3-5.)  He contends his SPA scores dropped in retaliation for his October 1997 complaints of discriminatory treatment.  (*Id.* at 4-5.)

Cook's 1997 SPA rated him as highly effective in eight areas and exceptional in one area. (PX 12.)  This appraisal, prepared by Colella and reviewed by Cawood, contained no negative comments, stating:

> He works well with a broad spectrum of people and is effective in spite of the geographic challenge and remote supervision. He has willingly accepted assignments and has been very responsive to ensure prompt closure of tasks. He has performed assigned tasks in a most efficient and effective manner. He has been an excellent coordinator, having to deal with numerous Segments to resolve issue. . . . Dependable and reliable, Regi[e] has been an asset to THAAD Weapon Systems Integration and the program.

(*Id.*)

The 1998 SPA, also prepared and reviewed by Colella and Cawood, rated Cook fully

effective in three areas and highly effective in six areas.  (*Id.*)  This review also contained no

negative comments, and stated:

> Mr. Cook is a well rounded engineer who understands the System Engineering process. He uses this process in his daily activities, specifically in the areas of specification development, functional analysis and . . . balancing of system and subsystem requirements. He has very good analysis capabilities, primarily at the detail level. He maintains good written communication skills and documents his tasks well.

(*Id.*)  The 1998 SPA also offered three suggestions for improvement to help Cook "develop

potential for increased responsibility as a System Engineering leader:"

(1)    Increase Communications up the Chain of Command: More frequent activity reports and status to the Huntsville Coordinator and increased visibility at Systems Integration Forums/Scorecards
(2)    Broaden scope by concentrating efforts more on programmatic issues (cost & schedule) versus detailed technical items
(3)    Demonstrate greater initiative in closing issues which go beyond the launcher segment.

(*Id.*)  Cook was given an RPL score of 10, entitling him to receive merit-based pay raises.  (PX

15; DX 34 at ¶ 15.)

The 1999 SPA, prepared by Eisenberger and reviewed by J. Ellis, rated Cook fully

effective in five areas and highly effective in four areas, with no negative comments and an RPL

score of 10. (DX 12.) The comment section provided:

> Mr. Cook supports the THAAD Dem/Val Flight Test Team and Objective System
> Launcher Product Development Team. He has been able to adapt needed changes
> to the D/V system successfully, as well as incorporate the requirements . . . into
> the EMD design specs. . . . He has strong and broad based technical skills, is a
> good writer and speaker, and knows the System Engineering process well.

(*Id.*) Cook also received a merit raise in 1999.[6] (DX 34 at ¶ 15.)

Cook describes two occasions upon which he alleges co-workers referred to him as a

"troublemaker." (*See* DX 28 at 134-41; *see also* Pls.' Br. at 5.) The first instance occurred in

1998, about six to twelve months after Cook voiced complaints regarding Grindstaff's selection

for the Huntsville Coordinator position. (DX 28 at 135-38.) At that time, certain of Cook's co-

employees in Huntsville notified Cook that they wanted to move a safe, which was used for

classified documents, from Cook's work area to a location closer to the other integrators. (*Id.* at

135-36.) Cook refused to move the safe. (*Id.* at 136-37.) According to Cook, Grindstaff and the

other co-employees then mumbled, "We'll get our own safe. I don't know why you want to be a

troublemaker." (*Id.* at 137-38.)

The second event occurred in late 1999, when Cook complained about having been

denied the promotion to hardware engineer, which Wheeler received.[7] (*Id.* at 138-41.) Wheeler

---

[6] Cook refused to sign the 1998 and 1999 SPA's when presented to him for his signature. (*Id.*)

[7] Cook implied at his deposition that he was denied the promotion Wheeler received in
retaliation for his complaint. Lockheed Martin defended this contention in its brief. However,
Cook stipulated at oral argument that this contention was not part of his claim in this case. Even
if it was, the court notes that Wheeler received the promotion at issue in spite of the fact that he

was selected based upon the evaluation of a three-person selection committee, which included a minority. (*Id.* at 139.)  Cook met with Bob Thompson ("Thompson"), his functional manager, who informed him that the position was awarded to a more qualified candidate. (*Id.*)  Cook inquired about "what it would take ... to improve upon the way I present my resume to get a promotion." (*Id.* at 140.)  Cook contends that Thompson then said, "Reggie, I am going to tell you the truth. . . . [Y]ou have gained a reputation around here of being a troublemaker." (*Id.*)

The final retaliation claim is based on Cook's assertion that he found an anonymous note in his chair in 1998, which contained the handwritten message: "you are being watched." (Pls.' Br. at 5; DX 28 at 151-52; DX 28 Tab A at 8-12, Ex. 7.)  Cook never reported the note to his supervisor or any other management official at Lockheed Martin, nor did he ever find out who authored the note. (*Id.* at 11, Tab 33.)

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the

---

had made complaints and filed charges along with Cook.

15

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.  DISCUSSION

**A.    Promotion Claims**

Plaintiffs claim that defendant denied them promotions on the basis of their race in violation of Title VII and 42 U.S.C. § 1981. The relative burdens of proof in Title VII and § 1981 disparate treatment claims are the same. *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991). In any action alleging disparate treatment by an employer, the plaintiff must prove that the employer acted with a discriminatory motive. *International Board of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). To establish a prima facie case of discrimination, a plaintiff may employ direct evidence of discriminatory intent, statistical proof of a pattern of discrimination, or circumstantial evidence. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989). The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon whether the plaintiff's proof is direct or circumstantial in nature.

16

a.      Circumstantial Evidence

There is no direct evidence to support plaintiffs' claims of discrimination.  Thus,

plaintiffs must rely on circumstantial evidence to support their claims.  Because plaintiffs are

relying on circumstantial evidence to support their claims, the court is governed by the familiar,

tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S.

248 (1981).  *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997)

(clarifying the standard to be applied under Eleventh Circuit jurisprudence).  Under this

framework, the plaintiff bears the initial burden of establishing a prima facie case of

discrimination.  *Burdine*, 450 U.S. at 252-53.  "The facts necessarily will vary in Title VII cases,

and the specification [] of the prima facie proof required from [plaintiff] is not necessarily

applicable in every respect to differing factual situations."  *McDonnell Douglas,* 411 U.S. at 802

n. 13.

If the plaintiff successfully establishes a prima facie case, the burden of production shifts

to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action.

*McDonnell Douglas*, 411 U.S. at 802.  Defendant's burden to rebut the presumption created in

such a situation is one of production rather than proof, requiring defendant to articulate a

legitimate, nondiscriminatory reason for its action.  *Burdine*, 450 U.S. at 257-58.  In satisfying

this burden:

> [t]he employer's burden of rebuttal is "exceedingly light."  Since  the rebuttal
> burden is one of production only, the employer "need not persuade the court that
> it was actually motivated by the proffered reasons . . . .  It is sufficient if the
> [employer's] evidence raises a genuine issue of fact as to whether it discriminated
> against the [employee]."

17

*Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1495 (11th Cir. 1989) (quoting *Burdine,* 450 U.S. at 254-55) (alterations in original).

If the defendant succeeds in carrying this burden, then any "presumption of discrimination created by the *McDonnell Douglas* framework drops from the case, and the factual inquiry proceeds to a new level of specificity." *Combs,* 106 F.3d at 1528 (quotation omitted). The plaintiff must then prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., discrimination or retaliation). *Id.* A plaintiff's prima facie case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See id.* at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

To avoid summary judgment, plaintiffs must submit sufficient nonconclusory evidence that defendant's articulated legitimate reasons for the employment decisions were pretextual. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471-72 (11th Cir. 1991); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989). Plaintiffs must put forth concrete evidence that casts sufficient doubt on defendant's proffered reasons such that a reasonable fact finder would conclude that those reasons did not actually motivate the promotion decisions. *See Combs*, 106 F.3d at 1538; *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1083-84 (11th Cir. 1990).

### b.   Wheeler

To establish a prima facie case of discriminatory failure to promote, Wheeler must prove that: (1) he is a member of a protected class; (2) he was qualified for and applied for the

18

promotion; (3) he was rejected in spite of his qualifications; and (4) the individual who received the promotion is not a member of the protected class and had lesser or equal qualifications. *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 642 (11th Cir. 1998).  Wheeler stipulated at oral argument that his discrimination claim for racial discrimination is based solely on his being denied the assignment to "Operator System Interface Development Head for EMD" on build four on October 1, 1997, as alleged in his complaint.  (Complaint at ¶ 9.)  Wheeler contends that Durrin, BM/C3I segment manager, the manager responsible for this job, assigned this position to Burke, a white engineering planner.  (Pls.' Br. at 5-6; DX 27 at 79-80.)

In this case, Wheeler has failed to establish a prima facie case because there is no proof that there was a vacancy to which he was denied advancement.  The evidence in the record reveals that no job entitled "OSI Development Head for EMD" exists or existed at Lockheed Martin, and there is no single Lockheed Martin employee whose job entails the responsibilities implied by that title.  (DX 33 at 76-77, 79-81, 104.)  Burke's self designation as the lead for the OSI of the THAAD EMD program did not involve a "promotion."  Burke testified that he never held a position described as OSI Development Head for EMD.  (PX Supp. 6 at 81, 87-88, 100, 102, 121-22, 123-24.)  It is undisputed that Burke did not receive a pay increase and, moreover, that Durrin, his supervisor, immediately told him that he did not hold or occupy any such position.  (DX 33 at 76-77, 79-81; PX Supp. 6 at 87-88, 121-22, 100, 105-06.)  Defendant's personnel policies did not require this assignment to be posted as a promotion.  (DX 34 at ¶¶ 5, 7, 8, 9, Ex. A, Ex. B.)  Further, to the extent Burke was, or claimed to be, empowered to change his own classification, it was not such a change that rises to the level of promotion.  (*See* PX Supp. 6 at 99-100, 105-06.)

Although Wheeler contends in his brief that "Burke was rated in his performance evaluation as the lead engineer for OSI," (*see* Pls.' Br. at 15), that assertion is incorrect.  Burke's performance evaluations for 1997, 1998, and 1999 rate Burke for his work as lead of the requirements effort for OSI, not the entire software development effort.  (PX Supp.6 at 99-100, 102; DX 33 at Ex. 4-6.)  Burke was not responsible for writing the actual software; rather, as Burke repeatedly explained in his deposition, he was responsible for developing the requirements, or specifications, from which the actual software for build four would be written.  (PX Supp. 6 at 76, 79-81, 99-100, 102, 126-27.)  Although Burke was heavily involved in developing the requirements for two segments of build four for EMD, he was never responsible for writing the actual software.  (*Id.* at 81, 110-11.)  Raytheon was responsible for writing the actual software.  (DX 33 at 81, 130-31, 133.)

Thus, the position about which Wheeler complains is a position that Lockheed Martin assigned to Raytheon and its employees.  Raytheon was responsible for writing the actual software for build four for EMD based upon the requirements documents developed, in part, by Burke.  (PX Supp. 6 at 76, 79-81, 99-100, 102, 126-27, 130-33; *see also* DX 33 at 81.)  In any event, no Lockheed employee ever held the position about which Wheeler complains.  (*See* DX 33 at 75-81, 104.)  To the extent that such a position existed with Raytheon, Raytheon would have filled such a position from among its current employees, a fact which would render Wheeler unqualified for the position.  (*See* DX 33 at 77.)

Even assuming a prima facie case, defendant has articulated legitimate, nondiscriminatory reasons for its decision.  Defendant presented evidence that it could not afford to move Wheeler from his critical role as lead engineer for software development on build three,

20

which was ongoing, to place him in a similar position over software development for build four, especially in light of the plan to shift responsibility for all of build four to Raytheon. (DX 33 at 104.)

Wheeler has failed to meet his burden of raising a genuine issue of fact with respect to the legitimacy of this articulated reason. Wheeler has not produced sufficient evidence on which a reasonable juror could find an actual intent on the part of defendant to discriminate against him on the basis of a prohibited factor, in this case, race. It is undisputed that, whatever Burke's job duties were, he did not receive an increase in pay or benefits to perform such duties. (PX Supp. 6 at 87-88.) Lockheed Martin did not give Burke a new job assignment in 1997 or 1998, and he has never received a promotion at Lockheed Martin. (*Id.* at 87, 100, 105-06.)[8] Wheeler has not presented any evidence as to why defendant would be responsible for filling this position as opposed to Raytheon.

Plaintiffs attempt to establish intentional discrimination on the part of defendant through (1) the fact that defendant's written policies allow some job assignments to be made without a formal selection process; and (2) anecdotal statistics allegedly reflecting the number of minorities in leadership positions within the entire Lockheed Martin Corporation. (Pls.' Br. at 17-21.) The court is of the opinion that neither is sufficient to establish intentional discrimination.[9]

---

[8] Wheeler applied for and received a promotion in May of 1999, (*See* DX 27 Tab A at 8-9), which, although not determinative, adds further support to the conclusion that defendant did not discriminate against Wheeler on the basis of his race.

[9] Plaintiffs cite *Nord v. United States Steel Corporation,* 758 F.2d 1462, 1468 (11th Cir. 1985), to support their claim that defendant's "subjective selection/promotion process lends itself to the consideration of impermissible factors, and is a violation of Title VII." (Pls.' Br. at 18.) However, the *Nord* case involved a company which had no practice of posting job openings and

21

In an individual case of disparate treatment, statistical information can be relevant and important. *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131 (11th Cir. 1984). However, statistics alone cannot establish a prima facie case of individual disparate treatment. *Id.* Statistics come in an infinite variety and their value depends on all of the surrounding facts and circumstances. *See Kilgo v. Bowman Transportation, Inc.,* 789 F.2d 859, 870 (11th Cir. 1986). "Establishing the percentage of members of a particular group in the employer's workforce (or a segment thereof), without more, proves nothing; the essence of statistical proof requires a comparison." II B. Lindeman & P. Grossman, Employment Discrimination Law 39, at p. 1689 (3rd Ed. 1996). In a disparate treatment case where low skill jobs are not at issue, the statistical evidence must be finely tuned to compare the employer's relevant workforce with the qualified population in the relevant labor market. *A.M. Alexander v. Fulton County, Georgia,* 207 F.3d 1303, 1327-28 (11th Cir. 2000).

Plaintiffs have not presented any data regarding: (1) a comparison of the number of minority applicants for positions at Lockheed; (2) the types of positions to which those minorities applied; or (3) the relative qualifications of those minorities compared to the employees actually selected for such positions. Further, plaintiffs have not identified the appropriate comparative labor pool in terms of geography or education and training. *See, e.g.,*

---

no established procedures or standards governing promotions. *Id.* at 1466-67. Because defendant has a practice of posting job openings and has written procedures and standards governing promotions, (*see, e.g.,* DX 30; DX 31; DX 34; PX 16), the court is of the opinion that the *Nord* case has no bearing on the present case. Further, and as recently reiterated by the Eleventh Circuit, "employment decisions may legitimately be based on subjective criteria as long as the criteria are capable of objective evaluation and are stated with a sufficient degree of particularity." *EEOC v. Joe's Stone Crab, Inc.,* 2000 WL 1089555, at ** 13, 29, n. 17. (11th Cir. Aug. 4, 2000).

*City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501 (1989) ("In the employment context, we

have recognized that for certain entry level positions or positions requiring minimal training,

statistical comparisons of the racial composition of the employer's work force to the racial

composition of the relevant population may be probative of a pattern of discrimination.  But

where special qualifications are necessary, the relevant statistical pool for purposes of

demonstrating discriminatory exclusion must be the number of minorities qualified to undertake

the particular task."); *Carter v. Ball,* 33 F.3d 450, 456-57 (4th Cir. 1994) (showing zero African-

American employees in an agency's management does not establish a prima facie case; there

must be a comparison of the percentage of African-Americans in the desired position with the

percentage of African-Americans in the qualified applicant pool); *Hawkins v. Ceco Corp.,* 883

F.2d 977, 985 (11th Cir. 1989) (the importance of evidence that the plaintiff was the only

African-American employee for a ten-year period is difficult to assess without comparative

evidence regarding the number of salaried positions); *Mays v. Chicago Sun Times,* 865 F.2d 134,

137 & n. 2 (7th Cir. 1989) (statistics on the number of African-Americans working as full-time

paper handlers are not probative of discrimination absent statistics concerning the number of

African-American applicants for such positions).

Wheeler failed to establish a prima facie case of discrimination because he was not

denied advancement to any vacancy.  Further, Wheeler failed to offer any evidence on which a

reasonable jury could find defendant's articulated reason to be pretext for illegal race

discrimination.  Additionally,  plaintiffs' attempt to establish intentional discrimination on the

part of the defendant through (1) the fact that defendant's written policies allow some job

assignments to be made without a formal selection process; and (2) anecdotal statistics allegedly

reflecting the number of minorities in leadership positions within the entire Lockheed Martin Corporation, is insufficient.  Thus, defendant is entitled to judgment as a matter of law on Wheeler's claims of discriminatory failure to promote.

        c.     Cook

To establish a prima facie case of discriminatory failure to promote, Cook must prove that: (1) he is a member of a protected class; (2) he was qualified for and applied for the promotion; (3) he was rejected in spite of his qualifications; and (4) the individual who received the promotion is not a member of the protected class and had lesser or equal qualifications. *Carter*, 132 F.3d at 642.  Cook's discriminatory failure to promote claim is based upon defendant's selection of Grindstaff for the position of deputy group manager for the THAAD program.

In this case, Cook's claim fails because there is no proof that there was a vacancy to which he was denied advancement.  The Deputy Group Manager position to which defendant appointed Grindstaff did not involve a change in classification, pay, or job code. (DX 32 at 74, 96-97.)  The duties carried no additional pay and  no additional benefits.  (PX Supp. 5 at 72.) Further, the only additional duties imposed by the job title involved acting as liaison between Sunnyvale and Huntsville on the THAAD project.  (DX 32 at 33-36, 46, 62-63, 69-71, 73, 86, Ex. 1.)  Lockheed Martin's policies did not require such position to be posted, and, therefore, defendant did not post the position.  (*Id.* at 95-97; DX 34 at ¶ 22.)  There was no denial of a position to which Cook could have been promoted.

Even if Cook had established a prima facie case as to this promotion, defendant has articulated legitimate, nondiscriminatory reasons for its decision.  Defendant has presented

evidence that it gave Grindstaff the assignment of Deputy Group Manager because he had superior communications skills, he had experience with the battle manager segment, and he had twenty-four years of military experience, which was vital to working with the THAAD Project Office. (DX 32 at 43-45, 52-53, 71-74.) Eisenberger, who selected Grindstaff, testified that he needed someone with military experience to offset his own limited experience in that area. (*Id.* at 56-57.) Additionally, Eisenberger testified that he observed both Grindstaff's and Cook's communications skills during the weeks before Grindstaff's selection, and that Cook was inaccessible, failed to attend some meetings, and provided reports to Eisenberger on the Huntsville integration work only when asked to do so. (*Id.* at 46-48, 52-53.) Grindstaff, on the other hand, exhibited the initiative to call Eisenberger every day with reports on the integration task, to report his dealings with the Army personnel, and to keep Eisenberger as informed as possible. (*Id.*)

Cook has not met his burden of raising a genuine issue of fact with respect to the legitimacy of these articulated reasons. Cook has failed to offer any evidence rebutting Eisenberger's reasons for the selection, as noted above. Thus, there is not sufficient evidence upon which a reasonable juror could infer that Cook was discriminated against based on his race.

Where a promotion decision is based on a good faith belief that the best qualified person was selected, the decision should not be second guessed by the court. *See Alexander,* 207 F.3d at 1341; *Simms v. Oklahoma ex rel Dept. of Mental Health and Substance Abuse Services,* 165 F.3d 1321, 1329-30 (10th Cir. 1999). Courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming*

*Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999).  The fact that the belief of

the employer is mistaken or later proven wrong does not establish discrimination.  *See Smith v.*

*P.A.P. Clinic*, 808 F.2d 1449, 1452-53 (11th Cir. 1987); *Moore v. Sears Roebuck and Company*,

683 F.2d 1321, 1323, n. 4 (11th Cir. 1982).

Cook failed to establish prima facie case of discrimination because there was no vacancy

to which a white applicant was elevated.  Further, even assuming a prima facie case, Cook failed

to offer any evidence on which a reasonable jury could find defendant's articulated reason for the

selection of Grindstaff to be pretext for illegal race discrimination.  As noted above, plaintiffs'

attempt to establish intentional discrimination on the part of the defendant through (1) the fact

that defendant's written policies allow some job assignments to be made without a formal

selection process; and (2) anecdotal statistics allegedly reflecting the number of minorities in

leadership positions within the entire Lockheed Martin Corporation, is insufficient.  Thus,

defendant is entitled to judgment as a matter of law as to Cook's claim of discriminatory failure

to promote.

**B.    Retaliation Claims**

Both plaintiffs filed a Request for Management Review with defendant alleging claims of

race discrimination followed by an EEOC complaint.  (DX 13; DX 15; DX 17-20.)  Plaintiffs

allege they were subjected to illegal retaliation for such conduct.  Under Title VII, employees are

protected from retaliation for opposition to unlawful employment practices or for making a

charge, testifying, or participating in any investigation, proceeding, or hearing under Title VII.

*See* 42 U.S.C. § 2000-3(a).  In analyzing plaintiffs' claims, the court is governed by the familiar,

tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*,

26

411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S.

248 (1981). *See Combs,* 106 F.3d at 1527-28 (clarifying the standard to be applied under

Eleventh Circuit jurisprudence).[10]

    a.    <u>Wheeler</u>

        *i.*    *Prima Facie Case*

In order to establish a prima facie case of retaliation, Wheeler must demonstrate, (1) that

he engaged in a statutorily protected activity; (2) that defendant took some adverse employment

action against him; and (3) that a causal connection exists between the two. *Morgan v. City of*

*Jasper,* 959 F.2d 1542, 1547 (11th Cir. 1992) (citations omitted); *Tipton,* 872 F.2d at 1494. In

order to establish that a causal connection exists between the two events, plaintiff "need only

show that the protected activity and the adverse action are not completely unrelated." *See, e.g,*

*Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1457 (11th Cir. 1998). Wheeler alleges that

he has suffered retaliation for complaining about alleged race discrimination by Lockheed Martin

in an internal complaint and in his EEOC charge. The acts of retaliation to which Wheeler cites

involve lower SPA scores, accompanied by negative comments, which he received subsequent to

his October 22, 1997, internal complaint. (Pls.' Br. at 21-22; DX 27 at 147-58.)[11] Wheeler

---

[10] This framework is set out in Part III. A(a) of this Opinion.

[11] Wheeler contended in his deposition that he was denied certain job assignments as a result of his internal complaints of discrimination and his EEOC charge. However, the selections about which he complained involved (1) jobs which were not required to be subjected to the formal selection procedure, or (2) job selections which were made over six months after Wheeler's charge was filed. Lockheed Martin managers asserted as the reasons for their selection of others for the other jobs Wheeler sought that the selected person was better qualified. Wheeler stipulated at oral argument that retaliation claims based on these events were not being pursued in this case. Thus, this opinion does not address those claims.

alleges that his "ratings dropped from exceptional and highly effective, to the lower category of fully effective" in retaliation for his protected conduct. (Pls.' Br. at 21-22.)

Wheeler has established that he engaged in a statutorily protected activity in that he filed an internal complaint of discrimination and an EEOC charge. (DX 13; DX 18-19.)  However, he has failed to establish a prima facie case of retaliation because he has not demonstrated an adverse employment action or a causal connection between any alleged adverse action and the protected activity.

Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions. *Wideman,* 141 F.3d at 1456.  However, not all employment actions are actionable under Title VII.  There is "some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause." *Id.*  "Courts agree that even under a liberal reading of adverse employment activity, an employee must ultimately show some employment injury." *Merriweather v. Alabama Dep't of Public Safety,* 17 F.Supp.2d 1260, 1273-74 (M.D. Ala. 1998) (citation and quotation marks omitted).  Thus, an employment action must affect a term or condition of employment and is not adverse merely because the employee dislikes it or disagrees with it. *Id.* at 1274.  Further, in order for a term or condition of employment to have been "affected," there must be a "demonstrable adverse impact on future employment opportunities or performances." *Id.* (citation and quotation marks omitted).

The allegedly retaliatory evaluations Wheeler received after filing an EEOC charge and an internal complaint of discrimination did not result in tangible adverse consequences. Wheeler's 1997 and 1998 SPA's are substantially the same, and both include very

complimentary remarks.  Further, on May 22, 1999, Wheeler was promoted to the BM/C3I

Hardware Lead position, which resulted in a higher pay grade.  (DX 34 at ¶ 16, Ex. I.)  The 1999

SPA was signed on June 30, 1999, and reflects, at least in part, his performance after one month

in a new position.[12]

   The court concludes that a reasonable jury could not find that these evaluations are

negative.  *See Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir. 1997) (where the

score at issue, based on new and expanded evaluation categories, was about thirty points lower

than the plaintiff's score in the previous year, the score still merited a "meets expectations" score

and was never used as a basis for any action against the plaintiff; thus, the court found that the

evaluation could not fairly be considered an adverse employment action); *Smart v. Ball State*

*University,* 89 F.3d 437, 442 (7th Cir. 1996) ("There is little support for the argument that

negative performance evaluations alone can constitute an adverse employment action.");

*Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir. 1994) ("meets expectations" score

on a new scale, even though lower than previous evaluations, fails to establish adverse

employment action absent evidence showing that such score was in fact negative); *Hartsfield v.*

*Miami-Dade County,* 90 F.Supp.2d 1363, 1375 (S.D. Fla. 2000) (plaintiff's claims that her

training was delayed and her evaluations should have been better were insufficient to establish an

adverse employment action where plaintiff had not been suspended, reprimanded, or terminated);

*Merriweather,* 17 F.Supp.2d at 1274 ("lower employee evaluation scores which still meet the

employer's expectations for employee performance and are not used as the basis for any

---

[12] Based in part on the adequacy of these evaluations, Wheeler received merit pay increases and
a promotion.  (DX 34 at ¶ 15-16.)

employment detriment are not 'adverse employment action' within the meaning of that element
of plaintiff's prima facie case of Title VII retaliation"). Wheeler's conclusory allegations that he
deserved better evaluation scores is insufficient to establish that the evaluations at issue
constituted adverse employment actions. Further, there is no evidence that any of the evaluations
at issue were used as the basis for any action against Wheeler.[13]

Even if the consequences of the alleged acts of retaliation resulted in tangible job
detriment, there is no evidence which would allow a reasonable factfinder to infer a causal
connection between Wheeler's protected conduct and the subsequent evaluations which occurred
at least six months later. No evidence, other than the order of occurrence, links these events.
"The mere presence of a temporal sequence which shows [an adverse employment action]
following the filing of the discrimination claim is, in and of itself, not sufficient to substantiate
the requisite causal connection." *Thurman v. Robertshaw Control Co.*, 869 F. Supp. 934, 942
(N.D. Ga. 1994). Where there is no direct evidence linking the protected activity and the adverse
employment action, the causal connection element may be established circumstantially by
showing a close time-link between the adverse employment action and the protected activity.
*See Baliaco v. University of Minnesota,* 737 F.2d 747, 749 (8th Cir. 1984). The shorter the

---

[13] Both Wheeler and Cook assert that these evaluations "directly affect[] the layoff rankings the
Plaintiffs will receive." (Pls.' Br. at 22.) The layoff ranking is based upon the employee's
number of full years of service, the employee's service score factor, and the employee's SPA
score. (PX 17.) Wheeler's layoff ranking was 11. (*Id.*) The lowest ranking in Wheeler's group
was 25. (*Id.*) Cook's layoff ranking was 5. (*Id.*) The lowest ranking in Cook's group was 11.
(*Id.*) Plaintiffs have offered no evidence as to how much a higher SPA score would have
changed this ranking. Further, this allegation amounts to nothing more than speculation about a
possible future event. The court concludes that such allegation does not meet the "threshold
level of substantiality," and, therefore, fails to establish an adverse employment action. *See
Wideman*, 141 F.3d at 1455.

period between the two events, the stronger the inference that the adverse action was improperly motivated.[14]

Wheeler has not produced sufficient evidence upon which a reasonable juror could infer that the evaluations about which he complains were improperly motivated. Wheeler filed an internal complaint of discrimination in October 1997, and an EEOC charge in November 1997. (Pl.'s Br. at 21-22; *see also* PX 13, PX 14.) Wheeler received the allegedly retaliatory evaluation in June 1998, approximately seven months later. Wheeler has failed to present evidence of a "causal link" between his protected conduct and his lower SPA scores. Thus, no inference of causal connection can be drawn.

### ii.   *Legitimate Nondiscriminatory Reason*

Even assuming that Wheeler has established a prima facie case, defendant has asserted legitimate, nonretaliatory reasons for its actions. Defendant asserts that these scores and comments were warranted, and that "Lockheed evaluated and promoted . . . Wheeler based on its good faith business judgment just as employees of all races were evaluated." (*See* Def.'s Br. at 38-39.)

---

[14] *See Balletti v. Sun-Sentinel Co.,* 909 F.Supp. 1539, 1549 (S.D. Fla. 1995) (fact that plaintiff's discharge occurred six months after internal company complaint did not establish prima facie case of retaliatory discharge); *Juarez v. Ameritech Mobil Communications, Inc.*, 746 F. Supp. 798, 804 (N.D. Ill. 1990) (six months between plaintiff's complaint and termination was too remote to establish causation); *Maldonado v. Metra*, 743 F. Supp. 563, 568 (N.D. Ill. 1990) (five-month period between protected activity and termination was too remote to establish causation); *Reeves v. Digital Equipment Corp.*, 710 F. Supp. 675, 677 (N.D. Ohio 1989) (no causal relation shown where three months passed between protected activity and adverse action); *Brown v. A.S.D. Computing Center*, 519 F. Supp. 1096, 116-17 (S.D. Ohio 1981) (termination four months after protected activity was too remote to establish causation).

### iii. *Pretext*

Wheeler has failed to raise a genuine issue of material fact that defendant's articulated reasons are a mere pretext for unlawful motives. Wheeler has offered no evidence whatsoever to refute defendant's assertion that these scores were warranted. Wheeler has offered nothing more than his own conlcusory allegations that his lower SPA scores were in retaliation for his engaging in protected conduct. Such conclusory allegations, without more, are insufficient to raise an inference of pretext or intentional discrimination. *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 444 (11th Cir. 1996); *Coutu v. Martin County Bd. of County Comm'rs.,* 47 F.3d 1068, 1074 (11th Cir. 1995); *Young v. General Foods Corp.,* 840 F.2d 825, 830 (11th Cir. 1988).

### b. Cook

#### i. Prima Facie Case

In order to establish a prima facie case of retaliation, Cook must demonstrate, (1) that he engaged in a statutorily protected activity; (2) that defendant took some adverse employment action against him; and (3) that a causal connection exists between the protected activity and the adverse employment action. *Morgan v. City of Jasper,* 959 F.2d at 1547 (citations omitted); *Tipton,* 872 F.2d at 1494. To establish a causal connection, however, a plaintiff need only show "that the protected activity and the adverse action were not wholly unrelated." *Clover v. Total System Services, Inc.,* 176 F.3d 1346, 1354 (11th Cir. 1999) (citations and quotations omitted). Cook alleges that in retaliation for his complaints of discrimination, he received lower performance evaluations, he was labeled a troublemaker, and he received an anonymous note stating that he was being watched.

32

Cook has established that he engaged in statutorily protected activity in that he filed an internal complaint of discrimination and filed a discrimination charge with the EEOC. (DX 15; DX 17.) However, his retaliation claim fails because he has not demonstrated an adverse employment action or a causal connection between any alleged adverse action and the protected activity.

Based on the analysis above, the court concludes that the evaluations about which Cook complains are not, in fact negative. Further, Cook received merit pay increases due, in part, to the adequacy of these evaluations. (DX 34 at ¶ 15.) The allegedly adverse employment evaluations, the statements labeling Cook as a troublemaker, and the note found in his chair (assuming it could even be attributed to Lockheed Martin) did not result in tangible job detriment to Cook and, based on the discussion above, do not rise to the level of an adverse employment action. Thus, Cook has failed to establish a prima facie case of retaliation.

Even if the consequences of the alleged acts of retaliation did result in tangible job detriment, there is no evidence which would allow a reasonable factfinder to infer a causal connection between Cook's protected conduct[15] and the subsequent evaluations, which occurred in April of 1998, and June of 1999. (*See* PX 12.)[16] No evidence, other than the order of

---

[15] Cook filed an internal complaint of discrimination on October 20, 1997, and a charge of discrimination with the EEOC on November 25, 1997. (*See* PX 11; PX 10.)

[16] Cook has offered no evidence other than his own speculation that the note found in his chair is in any way attributable to defendant. Cook does not even establish when he found the note. The first instance in which Cook was labeled a "troublemaker" occurred sometime between January of 1998 and July of 1998, which was between two months and eight months after Cook engaged in protected activity. (*See* DX 28 at 135-38.) The second instance occurred in May of 1999, (*See* PX 1 at 140; DX 27 Tab A at 8-9), which was well over a year after Cook's protected activity. Even if these acts constituted adverse employment actions, Cook has not produced sufficient

occurrence, links these events. "The mere presence of a temporal sequence which shows [an adverse employment action] following the filing of the discrimination claim is, in and of itself, not sufficient to substantiate the requisite causal connection." *Thurman*, 869 F. Supp. at 942. Where, as here, the alleged protected activity is not temporally close enough in time to establish an inference of causation, no prima facie case of retaliation is established. *See, e.g., Balletti,* 909 F.Supp. at 1549. Thus, the court is of the opinion that no inference of causal connection can be drawn, and Cook has failed to make out a prima facie case of retaliation.

ii.     <em>Legitimate Nondiscriminatory Reason</em>

Even assuming that the lower job evaluations constitute tangible job detriment and Cook has established a prima facie case, defendant has asserted legitimate, nonretaliatory reasons for its actions.  Defendant asserts that these scores and comments were warranted, and that "Lockheed evaluated and promoted Cook . . . based on its good faith business judgment just as employees of all races were evaluated. (*See* Def.'s Br. at 38-39.)

iii.     <em>Pretext</em>

Cook has failed to raise a genuine issue of material fact that defendant's articulated reasons are a mere pretext for unlawful motives.  Cook has offered no evidence establishing that the lower SPA evaluations were incorrect or unwarranted.  Cook has offered nothing more than conclusory allegations that his lower SPA scores were in retaliation for his engaging in protected conduct.  As noted above, such conclusory allegations, without more, are insufficient to raise an

---

evidence upon which a reasonable jury could infer a causal connection between such conduct and Cook's protected activity.

34

inference of pretext or intentional discrimination. *See Isenbergh,* 97 F.3d at 444; *Coutu,* 47 F.3d at 1074; *Young,* 840 F.2d at 830.

## IV.   CONCLUSION

For the foregoing reasons, the court is of the opinion that Defendant's Motion for Summary Judgment on Claims of Plaintiff Wheeler and Defendant's Motion for Summary Judgment on Claims of Plaintiff Cook are due to be granted.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this $2\frac{m}{n}$ day of August, 2000.

**SHARON LOVELACE BLACKBURN**
United States District Judge